UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK              Civ. Docket #:
-------------------------------------X
JOHN JOHNSON,

                        Plaintiff(s),

           - against -                    **COMPLAINT**

ABBOT HOUSE,
                              PLAINTIFF DEMANDS A TRIAL BY JURY
                    Defendant(s).
-------------------------------------X

     Plaintiff, by his attorneys, AKIN & SMITH, LLC, upon
information and belief, complain of the defendants herein as
follows:

**1.** This Court has jurisdiction over this matter since the
     plaintiff is a citizen of the state of Connecticut and the
     defendants are residents of the State of New York,
     pursuant to 28 USC 1332 in that there is complete
     diversity of citizenship and the matter exceeds, exclusive
     of interest and costs, the sum of $100,000.00.

**2.** Venue is appropriate in that the Defendant ABBOT HOUSE has
     its principal location in the County of Westchester which
     belongs to the Southern District Court.

3. That at all times hereinafter mentioned, plaintiff, JOHN
     JOHNSON, was and still is a resident of the State of
     Connecticut.

## PARTIES

4. Plaintiff is a white male who was employed by Defendant.

5. Defendant is an "employer" as defined under New York State Law.

## MATERIAL FACTS

6. John Johnson, a former Unit Administrator ("UA") with Abbot House makes these allegations in connection with claims arising from his employment and termination from Abbott House.

7. Abbott House has engaged in retaliatory conduct against Mr. Johnson by terminating his employment after he came forward with information regarding Abbott House's discriminatory hiring practices and its failure to follow generally accepted practices (and mandated reporting procedures) regarding sexual harassment; and has discriminated against Mr. Johnson based on his gender by failing to promote him to the position of Assistant Director of MRDD.

8. Abbott House's actions violate New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("Human Rights Law").

BACKGROUND

9.    Mr. Johnson brought to Abbott House 18 years of experience in a managerial capacity in the field of Mental Retardation and Developmental Disabilities. He began his employment there on June 30, 2003. His duties as Unit Administrator included staffing five Abbott House facilities, all of which are located in Rockland County, New York. Such facilities are Palisades Court, Murphy House, and Pine Court, which are Individual Residential Alternative ("IRA") facilities, and Gessner Terrace and Wood Street, which are Intermediate Care Facilities ("ICF"). Mr. Johnson worked for the Abbot House department known as Mental Retardation and Developmental Disabilities ("MRDD").

10.   For the length of Mr. Johnson's employment George Hoehmann, MRDD Department Director, was Mr. Johnson's immediate supervisor; Gerry Dohrenwend was the Associate Executive Director and Mr. Hoehmann's supervisor, Myra Gray was the Director of Human Resources. Abbott House presently employs Mr. Hoehmann, Ms. Gray and Mr. Dohrenwend in these same capacities. Dennis Barry was the prior Chief Executive Officer ("CEO") and Executive Director until his retirement in or about September 2004.

11.  Mr. Johnson was a dedicated employee who consistently received praise from his supervisor, Mr. Hoehmann.  In a memo to Ms. Gray dated December 16, 2003, he told her "of the excellent work that John Johnson has consistently performed since coming to Abbott House earlier this year"; and stated that Mr. Johnson was "a diligent worker" who "brought standards up to a level not previously achieved."  Mr. Hoehmann further commended Mr. Johnson's "exemplary efforts" and said his work "has resulted in a dramatic improvement in services."  Mr. Hoehmann requested a salary increase based on Mr. Johnson's excellent performance.

12.  Mr. Hoehmann gave Mr. Johnson a written "Employee Performance Report" ("Report") dated December 30, 2003. The Report indicates that Mr. Johnson received the highest "Degree of Performance" for each and every category listed on the evaluation.  The categories include: knowledge of work, quality of work, quantity of work, ability to learn, cooperation – ability to work with others, interest in work, judgment, and supervision.  In the "Assessment of overall performance," Mr. Hoehmann wrote:

> John Johnson has made a real difference in running the Rockland programs.  Mr. Johnson possess[es] a[n] extensive knowledge of OMRDD programs and has brought a level of professionalism and team building to the UA

position ... I have the highest praise for
the quality of Mr. Johnson['s] work and
expect that he will continue to be a very
positive and strong force within the
department for many years to come.

13.  Mr. Johnson also received an Interoffice Memo dated

March 3, 2004 from Mr. Dohrenwend, commending his work,

which was copied to Ms. Gray and Mr. Barry.   Mr.

Dohrenwend states in such memo, "I want to take the time

to congratulate you on your hard work with regard to the

limited fiscal audit recently completed for the OMRDD

Department.   Through the hard work of yourself and your

staff the results, once again, indicated the quality and

good practice of our programs."   By all measures, Mr.

Johnson was an employee in good standing, and was seen as

an asset to the MRDD Department and to Abbott House.


<u>Unlawful Retaliation & Discrimination</u>

14.  Abbott House engaged in retaliatory conduct against Mr.

Johnson after he made his superiors aware of the

following violations of standard Human Resource practice:

- The first issue involves discussions between Ms. Gray and Mr.
Johnson regarding the unfair hiring practices of Abbott House.
In or around July 2003, Mr. Johnson received a call from Janet
Moore, a Human Resources Assistant at Abbott House, who told
him that Ms. Gray wanted to speak with him in her office.
When Mr. Johnson went to see Ms. Gray, she was temporarily
unavailable.   Ms. Moore then told Mr. Johnson that Ms. Gray
wanted to meet with him to tell him to "diversify the
workforce", not to accept applications from individuals of
Haitian national origin, and not to consider Haitians for

employment in the Rockland County facilities. She instructed Mr. Johnson, as per Ms. Gray's directives to look for applicants who are Caucasian, African American, Hispanic or of other national origin. Mr. Johnson did not speak to Ms. Gray that day but at an informal meeting the following week, Ms. Gray substantiated what Ms. Moore had said, and told Mr. Johnson that she would not be reviewing applications from individuals of Haitian national origin for Rockland County. (Mr. Johnson told Mr. Hoehmann what had occurred in the meeting with Ms. Moore and again a week later with Ms. Gray, and stated that it was illegal to screen applicants based on national origin.  Mr. Hoehmann discussed the issue with Mr. Dohrenwend).) Mr, Johnson asked Ms. Gray again about the practice of hiring Haitians in a meeting in her office on some 16 months later, on November 29, 2004.  Mr. Johnson told Ms. Gray that he had Haitian applicants he wanted to process and asked her if the hiring ban he was instructed to implement was still in effect. Ms. Gray stated, with regard to Haitian employees, that Abbott House "w(as) overwhelmed with them," and "they're a pack." Ms. Gray further stated that "there's always a leader of the pack," and described a Haitian woman who had been terminated as "vindictive" and "angry." Ms. Gray stated that "Dennis Barry certainly said, look, there are other persons out there." and that "he knows about the problem, he lives over there" (in Rockland County).  She said she would ask the new Executive Director if Mr. Barry's policy of banning Haitians was still in effect since he was now retired.

Mr. Johnson then informed Ms. Gray for the second time that he had Haitian applicants he wanted to process for hire, and Ms. Gray shook her head no.  Ms. Gray then said, "Bad business, really it is.  It'll come back and not haunt you, because you won't be here, to haunt somebody else."  (Mr. Johnson wondered what Ms. Gray meant by saying that he would not be there).

- The second issue, which occurred in August 2004, involves a sexual harassment concern.  A male direct-care worker at a Rockland County facility told Mr. Johnson that a co-worker made inappropriate sexual advances toward him, including unwelcome and inappropriate touching.  At this time Mr. Hoehmann was on vacation, and therefore not available, so, Mr. Johnson wrote a "Confidential Memorandum" to Mr. Dohrenwend dated August 12, 2004 explaining the alleged incident and faxed the memorandum to both Mr. Dohrenwend and Ms. Gray. After faxing the "Confidential Memorandum" to Mr. Dohrenwend, Mr. Johnson then called him on the phone to discuss the issue, nd Mr. Dohrenwend asked Mr. Johnson,  "how are you going to handle this"?  Mr. Johnson said that he would follow Human Resources policy and procedure on harassment, and that he

would call Ms. Gray for directives. Mr. Johnson then called Ms. Gray who said she was not able to address any concerns until the week of September 13, 2004 after she was back from vacation, and after she completed planning for the employee recognition luncheon.

The matter remained un-addressed. When Mr. Hoehmann returned from his vacation in September 2004, Mr. Johnson informed him that the sexual harassment issue had still not been addressed, and that the human resource department's refusal to take action failed to protect the interests of both the other employees and of the residents of the facility. Still, the matter remained unresolved.

In November 2004, Mr. Johnson again raised the sexual harassment issue again with Mr. Hoehmann. While Mr. Johnson was in Mr. Hoehmann's office, Mr. Hoehmann called Mr. Dohrenwend and told him the issue had not been addressed. Mr. Dohrenwend responded that it was Human Resources' problem and he was "not going to touch it". Mr. Hoehmann expressed concern to Mr. Dohrenwend in that telephone conversation that the alleged abuser may also be a sexual predator, and may subject the residents to abuse. Over and over again, Mr. Dohrenwend stated that "this is a human resources problem, and we (MRDD) are not going to touch it".

Having been made fully aware of potential abuse, Mr. Dohrenwend failed to perform the duties of a mandated reporter according to OMRDD regulations. The regulations specify that mandated reporters are obligated to report all cases of known or suspected abuse, that the suspect be removed from their position pending further investigation thereby preventing the risk of further abuse, and that the allegation be reported to the state authorities immediately for further investigation.

On November 29, 2004, Mr. Johnson again expressed his concern to Ms. Gray that the person accused of sexual harassment was still working at the facility. Ms. Gray asked if there were any further allegations, and Mr. Johnson replied that there were not. Ms. Gray, also a mandated reporter, blithely dismissed the issue and said, "You know that saying, if it's not broken…." This conversation was recorded on audiotape, which is in our possession.

- The third issue concerns the department's actions with regard to Mr. Johnson's candidacy for the position of Assistant Director of MRDD. Throughout Mr. Johnson's employment, Mr. Hoehmann repeatedly expressed hope that he could appoint Mr. Johnson the Assistant Director position when it became available, and told Mr. Johnson that he was the desired

candidate.   To that effect, Mr. Hoehmann told Mr. Johnson
several times that he would not interview other candidates for
the position, but would appoint Mr. Johnson.   The precedent
for appointing (rather than interviewing) candidates was
already set when the department appointed Mr. Jonathan Lukens
to a senior position without posting the position or
interviewing other candidates. Mr. Hoehmann stated that there
might be some opposition to Mr. Johnson's appointment because,
according to Mr. Hoehmann, Ms. Gray had previously told him
that his department was not going to be run by all white
males.  In approximately June of 2004, Abbott House put out an
ad for the position of Assistant Director. Mr. Hoehmann wrote
the ad to correspond specifically to Mr. Johnson's credentials
so Mr. Johnson would be seen as the most qualified candidate.
In particular, the position called for a Master's level of
education, which Mr. Johnson possesses.

Mr. Johnson wanted the position because it would have been a
promotion for him and a salary increase.  Mr. Johnson was
widely regarded by others in the department and others within
the agency as the best-qualified and most desirable person for
the position. In July 2004, Mr. Johnson interviewed with Mr.
Dohrenwend for the Assistant Director position. Following that
interview, both Mr. Hoehmann and Mr. Dohrenwend recommended
Mr. Johnson for the position and sent the approval to Human
Resources for a salary determination, so they could make Mr.
Johnson a formal offer.  However, in September 2004, in an
abrupt reversal, Mr. Hoehmann told Mr. Johnson that he was not
able to offer Mr. Johnson the position.  Mr. Hoehmann told Mr.
Johnson that his promotion had now become "a hard sell", and
"as far as Myra as concerned it was out of the question".  He
said that Ms. Gray had recommended that he continue
interviewing all available candidates, and told him that she
was going to continue to advertise the position.  Ms. Gray
then placed another ad, effectively vetoing Mr. Johnson's
candidacy despite the endorsement from Mr. Hoehmann and Mr.
Dohrenwend. She told Mr. Hoehmann that she was opposed to Mr.
Johnson's promotion, and that she would fight it at every
level, including going to new Executive Director if necessary.


In or about October 2004, Maureen O'Conner, a female, was
offered and accepted the Assistant Director position.  Most
staff members were incredulous that Ms. O'Conner received the
promotion over Mr. Johnson.  Upon information and belief, Ms.
O'Conner does not possess a Master's level of education, and
has been viewed by staff members as disorganized, lacking
computer skills, and is known to be afraid to drive on
highways and bridges. The position involves crossing the
Tappan Zee Bridge several times per week, and driving highways

regularly. Mr. Hoehmann told Mr. Johnson that the decision to promote Ms. O'Conner was a political decision that had been taken out of his hands. His statement is supported by the fact that the announcement of Ms. O'Conner's promotion was sent out in a memo, not from Mr. Hoehmann, the Director of the department, but from Mr. Dohrenwend, his supervisor.

Upon learning that he was not being promoted to the Deputy Director position, Mr. Johnson informed Mr. Hoehmann that he was resigning. Mr. Johnson wrote a letter of resignation dated September 15, 2004. Thereafter, Mr. Hoehmann told Mr. Johnson that he would not accept Mr. Johnson's resignation because the department could not do without him. Mr. Hoehmann further told Mr. Johnson to "stay viable and hang in there". Mr. Hoehmann then offered Mr. Johnson a part-time position for 20 hours per week, which Mr. Johnson accepted. Mr. Johnson worked 20 hours per week from approximately mid-October, 2004 to the end of December 2004 when he was terminated, as discussed below.

On December 6, 2004, Mr. Johnson informed Mr. Hoehmann of his conversation with Ms. Gray regarding Haitian applicants. Mr. Hoehmann responded, rhetorically, "We actually have an agency policy where we are not supposed to hire Haitians?" Mr. Hoehmann stated that he was opposed to the policy and would talk to Ms. Gray. Mr. Johnson asked Mr. Hoehmann not to talk to Ms. Gray, because he was sure that such a conversation would get him fired. Ms. Gray had already said to Mr. Johnson in the November 29th conversation that "You won't be here" and Mr. Johnson believes that this fortold of her plans to fire him. Mr. Johnson told Mr. Hoehmann that Ms. Gray had blocked his promotion, despite his being recommended by both Mr. Hoehmann and Mr. Dohrenwend as retaliation for causing her to be reprimanded by Mr. Dohrenwend. Mr. Johnson asked Mr. Hoehmann several times not to go forward with the information at this time as he was sure his employment would be terminated. Mr. Johnson was aware of retaliation already exercised by Ms. Gray on employees suspected of reporting HR's violation of minimum wage practices earlier in the year. Two of the three employees who were thought to be involved were fired, one demoted. Mr. Johnson was instructed by Ms. Gray to fire one of these employees she said, "do whatever it takes". At the end of the conversation with Mr. Hoehmann on 12/6/04, Mr. Johnson said that Ms. O'Conner was (an) acceptable (candidate) because she is a female. Mr. Hoehmann responded, "I wanted to get a female in upper administration."

Mr. Johnson explained the circumstances of Ms. Gray's reprimand to Mr. Hoehmann and said he believed Ms. Gray single-handedly stopped his chances for promotion as

retaliation for telling Mr. Dohrenwend about the HR practice (of allowing direct care employees to choose transfers without being interviewed). On or about September 9, 2004, Mr. Dohrenwend who, using his temporary authority as Acting Executive Director, called Ms. Gray at home, while she was on vacation, and reprimanded her for the practice. Mr. Dohrenwend made it clear to Ms. Gray that Mr. Johnson was the one who told him about the practice and said, "as Acting Executive Director in Mr. Barry's absence, I'm telling you to stop it". This increased tension between Mr. Dohrenwend and Ms. Gray and she viewed the reprimand as Mr. Dohrenwend's sabotage of her candidacy for the Executive Director position. Both she and Mr. Dohrenwend were candidates for the Executive Director position and there was intense competition between them at the time.

On December 13, 2004, a Monday, Mr. Hoehmann informed Mr. Johnson that he spoke with Mr. Dohrenwend about the policy regarding Haitian applicants. According to Mr. Hoehmann, Mr. Dohrenwend said that even if Mr. Johnson came forward with an accusation, it would be Ms. Gray's word against Mr. Johnson's and could not be proven. Mr. Johnson informed Mr. Hoehmann that he had irrefutable evidence of Ms. Gray's statements.

On December 15, 2004, a Wednesday, Mr. Hoehmann called Mr. Johnson and told him that his employment was terminated, and that he would finish out the week. His last date of employment would be the following Monday, December 20, 2004. Meanwhile, HR had already processed termination papers effective Sunday, 12/19/04. When Mr. Johnson reported to work on 12/20/04, for his last day of employment, HR told him that he had already been terminated.

15. Mr. Johnson engaged in protected opposition to an employment practice made unlawful by New York State Law.

16. Abbott House's policy against hiring Haitians in its Rockland County facilities is a refusal to hire based on national origin, violates NYS Human Rights Law.

17. Mr. Johnson suffered termination, an adverse employment action.

18. The timing of Mr. Johnson's termination, just two days after informing Mr. Hoehmann that he had irrefutable

evidence, establishes a causal connection between Mr. Johnson's activity and subsequent termination.

19. Abbott House's failure to reinstate Mr. Johnson following his letter to Defendants dated December 20, 2004, stating that he was required to enforce a ban against hiring Haitian applicants and also requesting reinstatement, constitutes further retaliation.

20. Based on the foregoing, Abbott House unlawfully terminated Mr. Johnson in retaliation for his protected activity regarding Abbott House's discriminatory policy against Haitians and a sexual harassment issue.

Claims Based on Gender

21. Mr. Johnson, a white male, was qualified for the position of Deputy Director, which would have been a promotion.

22. Mr. Johnson received an outstanding evaluation from his supervisor, and his supervisor believed Mr. Johnson to be the person who should get the position.

23. Mr. Johnson was denied the promotion under circumstances in which the Director of Human Resources had previously stated that the department was not going to be run by all white males, and in which Mr. Johnson's

supervisor stated that he wanted to get a female in upper administration.

24. A less-qualified female was, in fact, given the position for which Mr. Johnson applied.

25. Defendants unlawfully discriminated against Mr. Johnson by failing to promote him on the basis of his gender.

26. Mr. Johnson has been subject to unlawful discrimination as well as a hostile work environment. As a result he has been unable to return to work and suffers emotional distress, anxiety, humiliation, loss of pay and numerous expenses in an effort to ameliorate these conditions.

27. As a result of defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

28. Defendants created an environment which no reasonable person in Plaintiff's position would be expected to tolerate.

29. Defendants failed to take any steps to stop the above behavior and the defendants conduct amounted to a condoning, ratification, approval, and perpetration of the behavior and a hostile environment.

30. Plaintiff was forced to resign from his position because of the intolerable retaliation, harassment and discrimination described herein.

31. Plaintiff was fired from his position.

32. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

## AS A FIRST CAUSE OF ACTION

## FOR DISCRIMINATION UNDER STATE LAW

33. Plaintiffs repeats and realleges each and every allegation made in the above paragraphs of this complaint.

34. New York State Executive Law §296(1)(a) provides that it shall be an unlawful discriminatory practice: "For an employer . . . because of . . . sex. . . of any individual. . . to discharge from employment such individual or to discriminate against such individual in . . .terms, conditions or privileges of employment."

35. Executive Law § 296 provides that   "1. It shall be an unlawful discriminatory practice:  "(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to

discriminate against such individual in compensation or in terms, conditions or privileges of employment."

36. Defendant engaged in an unlawful discriminatory practice by constructively and actually discharging and otherwise discriminating against the Plaintiff because of his sex.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

37. Plaintiffs repeats and realleges each and every allegation made in the above paragraphs of this complaint.

38. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

"For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

39. Defendant engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiff because of his opposition to the unlawful employment practices of his employer.

## INJURY AND DAMAGES

40. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to reputation, loss of enjoyment of life, and other non-pecuniary losses.

**WHEREFORE**, Plaintiffs respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful employment practice prohibited by state common law, New York State Executive Law §296 et. Seq. and that the Defendants harassed, discriminated against, constructively and unlawfully discharged, and retaliated against Plaintiff on the basis of his gender;

B. Awarding damages to the Plaintiff, retroactive to the date of her discharge, for all lost wages and benefits resulting from Defendant's unlawful discrimination and to otherwise make him whole for any losses suffered as a result of such unlawful employment practice;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in the amount of TWO MILLION DOLLARS ($2,000,000);

D. Awarding Plaintiff punitive damages in the amount of TWO MILLION DOLLARS ($2,000,000);

E. Awarding Plaintiffs attorney's fees, costs, and expenses incurred in the prosecution of the action;

F.  Awarding Plaintiffs such other and further relief as the Court may deem equitable, just and

proper to remedy the Defendant's unlawful employment practices.


Dated:        New York, NY
              April 9, 2003


                            **AKIN & SMITH, LLC**

                        By:_____

                            Derek T. Smith



                        Attorneys for Plaintiff
                        305 Broadway
                        Suite 1101
                        New York, NY 10007
                        (212) 587-0760



                    <u>**AS A THIRD CAUSE OF ACTION**</u>
                <u>**FOR DISCRIMINATION UNDER STATE LAW**</u>


1. Plaintiff repeats and realleges each and every allegation made

   in the above paragraphs of this complaint.

2. The Pennsylvania Human Relations Act provides that it shall be

   an unlawful discriminatory practice: "For any employer because

   of the race, color, religious creed, ancestry, age, sex,

   national origin . . . to discharge from employment such

   individual . . . or to otherwise discriminate against such

individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment. . ."

3. Defendants engaged in an unlawful discriminatory practice by creating a discriminatorily hostile work environment, constructively discharging and otherwise discriminating against the Plaintiff because of her Gender, Race and National Origin.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

4. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

5. The Pennsylvania Human Relations Act provides that it shall be an unlawful discriminatory practice:

"For any . . . employer . . . to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act. . ."

6. Defendants engaged in an unlawful discriminatory practice under State Law by discharging and otherwise discriminating against the Plaintiff because of her opposition to the unlawful employment practices of her employer.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

7. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

8. The Pennsylvania Human Relations Act provides that it shall be an unlawful discriminatory practice:

> "For any . . . employer . . . to aid, abet, incite compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice. . ."

9. Defendants engaged in an unlawful discriminatory practice in violation of State Law by aiding, abetting, inciting, compelling and coercing the discriminatory conduct outlined above which culminated in plaintiff's forced resignation.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE
## AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA)

10. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

11. Age Discrimination in Employment Act (ADEA), 29 U.S.C. Section 621, 623 states in relevant part, "(a) It shall be unlawful for an employer- (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise

adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter. (b) It shall be unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age."

12. Defendants discriminated against Plaintiff on the basis of her age and violated the ADEA.

## INJURY AND DAMAGES

13. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to her reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practice prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et. Seq. ("Title VII"), The Fair Labor Standards Act of 1938, 29 U.S.C. §206(d), and the Equal Pay Act of 1963, 29 U.S.C. §206(d), state common law, Pennsylvania Human Relations Act and that the Defendants harassed, discriminated against, constructively discharged, and retaliated against Plaintiff on the basis of her national origin, race, and gender;

B. Awarding damages to the Plaintiff, retroactive to the date of her constructive discharge, for all lost wages and benefits resulting from Defendants' unlawful constructive termination of her employment and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

C. Ordering the termination of Mark Geroulo from the defendant companies and the reinstatement of Plaintiff to her position, and/or future income to the Plaintiff in an amount to be proven representing all loss of future earnings, including reasonable and expected increases, bonuses, loss of retirement income and all other benefits she would have expected to earn

during her entire lifetime had it not been for Defendants'
unlawful constructive discharge of Plaintiff's employment;

D. Awarding Plaintiff compensatory damages for mental, emotional
and physical injury, distress, pain and suffering and injury
to her reputation in an amount to be proven;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorney's fees, costs, and expenses
incurred in the prosecution of the action;

G. Awarding Plaintiff such other and further relief as the Court
may deem equitable, just and proper to remedy the Defendant's
unlawful employment practices.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:    New York, NY
          January 28, 2004


                    **AKIN & SMITH, LLC**

          By:_____

              Derek T. Smith


          Attorneys for Plaintiff
          305 Broadway
          Suite 1101
          New York, NY 10007
          (212) 587-0760

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
----------------------------X
EDITH JOHNSON,              |
                           |
        Plaintiff          |
                           |
                           |        No. 03-6559
        v.                 |
                           |
                           |
CHASE HOME FINANCE,        |
J.P. MORGAN CHASE & CO.,   |
And CHASE MANHATTAN MORTGAGE|
CORPORATION,               |
                           |
        Defendants         |
                           |
----------------------------X
```

-------------------------------------------------------------

**AMENDED COMPLAINT**

-------------------------------------------------------------

**AKIN & SMITH, LLC**
Attorneys for Plaintiff
305 Broadway
Suite 1101
New York, NY 10007
(212) 587-0760

41.